| .SUSAN M. CHEHARDY, Judge.
Scott Fredericks appeals the dismissal of his workers’ compensation claim by the Office of Workers’ Compensation (“OWC”). We affirm.
The claimant, Scott Fredericks, worked for Beverly Industries, Inc. as a truck driver and truck maintenance mechanic. He filed a disputed claim for compensation on December 5, 2003, in which he claimed to have been injured on November 11, 2003, when a fellow employee, Albert Allen, hit him over the head with a fire extinguisher. Fredericks alleged he suffered headaches and pain in his neck, hand, arm and ankles. He also stated that after he reported the incident to his employer, he was terminated from his employment for engaging in horseplay. He sought benefits, medical payments, and penalties and attorney’s fees for arbitrary and capricious denial of benefits and for wrongful termination.
Beverly Industries, Inc. responded that the claim had been denied because Freder-icks was the initial aggressor in the altercation at issue, there was no accident in the course and scope of employment for purposes of worker’s compensation, and Fredericks has no disability that prohibits him form working and earning wages equal to his wages at the time of his injury. Alternatively, Beverly asserted that any disability preexisted the injury alleged in this case. It also asserted, generically, any affirmative defenses that might be available to it, |,.¡without specifying particulars. Beverly denied liability for benefits, medical expenses, or penalties and attorney’s fees.
Subsequently, Fredericks moved to strike Beverly’s generic assertion of the affirmative defense of fraud. After a hearing, a consent judgment issued, allowing Beverly to amend its pleading to allege fraud with particularity. Beverly filed a Supplemental and Amended Answer, in which it asserted that Fredericks made misrepresentations in claiming that he was injured in the course and scope of his *449 employment, claiming that he is disabled, claiming that he is unable to work, and in denying previous accidents, injuries, medical treatment, and/or lawsuits or claims.
The matter was tried on August 18, 2004. The OWC judge rendered a judgment that included factual findings, as follows:
The Court listened attentively to the testimony of the witnesses and observed their demeanor. It has considered the entire record in this matter: the pleadings, the testimony of the witnesses, both live and by deposition, the exhibits and stipulations of the parties, and the arguments and memorandums of counsel.
From all of the above the Court has concluded that Claimant was not a credible witness; that he has willfully made false statements under oath for the purpose of receiving workers’ compensation benefits, and that other witnesses and other evidence have discredited or cast serious doubt upon Claimant’s version of the work-related altercation and its aftermath. In addition, there is no evidence in the record that any doctor has disabled Claimant from working as a result of his alleged work-related injuries.
Considering the applicable law and the evidence the Court concludes that the disputed workers’ compensation claim of Scott Frederick has no merit....
Accordingly, the OWC judge dismissed the claim, held that Fredericks had violated the provisions of La.R.S. 23:1208 by willfully making false statements under oath for the purpose of receiving workers’ compensation benefits, and directed that the claim be referred to the OWC Fraud Unit for further proceedings.
l4On appeal, Fredericks contends the OWC judge committed manifest error in determining that he did not suffer a com-pensable work-related injury, in finding that he is not entitled to indemnity and medical benefits, in determining that the employer was not arbitrary and capricious in denying his claim, and in determining that he committed fraud in an effort to obtain benefits. He also asserts he was wrongfully terminated from his employment.
EVIDENCE
The testimony at trial established that there was an altercation between Freder-icks and his coworker, Albert Allen, in the truck yard of Beverly Industries; the police were called; neither participant pressed charges against the other, nor did the employer press charges; the participants both declined medical treatment at the time of the incident; the participants left the premises at the employer’s insistence. Subsequently both men were terminated from employment, in accordance with company policy against fighting.
Fredericks testified that he reported Allen to their supervisor for failing to check the oil in a truck. Later Allen confronted him, complaining that Fredericks should have talked to him before going to the supervisor. Fredericks said he then admonished Allen about completing his work duties. According to Fredericks, the men then separated to go about their duties, but later in the day Allen again approached him and brought up the earlier event. Fredericks said he tried to ignore Allen, but that Allen hit him from behind with a fire extinguisher, with enough force to knock him to the ground.
Fredericks said he thought Allen was going to hit him again, so he kicked Allen in the groin. Allen then fell on him and the two wrestled. Fredericks said Allen had scratch marks from the wrestling and his shirt was torn. Allen “managed to *450 break loose,” jumped up, and said he was going to call the police.
| ¡¡Fredericks said he “saw stars” and was immediately dizzy, felt “woozy,” and could barely walk. He said his injuries would have been obvious to anyone. When asked why he didn’t go to a hospital at the time, he said he “wasn’t that hurt” and he didn’t have insurance. Fredericks also said he waited to leave the premises until later because Allen “was so crazy they had to force him to leave.” Fredericks claimed that Allen “still wanted to fight,” was cursing, was loud, “they couldn’t control him,” and wouldn’t leave, so they told Fredericks to sit in the shop to wait for Allen to leave. Fredericks said he saw the police arrive, but they stayed up front by the office and did not try to speak to him. He said that immediately after the police left, Allen confronted him again, challenging him to fight. He said he left to go home after Allen left.
Fredericks stayed home from work the next day, and the day after that he saw a doctor, who sent him to a hospital emergency room, where he underwent x-rays and a CT scan. They gave him medication and referred him to a bone specialist, who x-rayed him, gave him some prescriptions, and said, “Wait and see.” He then saw a doctor at the Culicchia clinic, where he was still being treated at the time of trial. He claimed that his instructions from these physicians were to stay under doctor’s care and that he was unable to go to work.
He said when he first saw Dr. Friley, his complaints were dizziness, headaches, and pain in the lower neck, back, knee and ankle. He denied having any of these pains prior to the incident, except for headaches, which he said was due to problems with his eyeglass prescription.
Fredericks testified that he went to pick up his check “about three weeks later” and learned he had been terminated.
Albert Allen testified that he and Fred-ericks had a heated verbal exchange over some work issues and Allen later approached Frederick to chide him for his 1 ¡¡manner of speaking. Allen said Frederick told him, “Get the fuck out of my face,” and threatened to kill him. Allen said, “I told him do what he feels he’s got to do.”
Allen said Fredericks invited him to go outside the gates and, as he turned to walk outside the gates, Fredericks jumped him from behind. Allen admitted he had carried a fire extinguisher in his hands and that he wanted to strike Fredericks with it, but he denied using it. According to Allen, when Fredericks invited him to go outside the gate, he put down the fire extinguisher and turned around to go outside the gate. At that point, he said, Fredericks attacked him, with his arms swinging in every direction. Allen felt a sharp pain in his side and back, like somebody scratching or cutting him. Allen “covered himself up,” but Fredericks kept striking him. Allen demonstrated his position on the stand, and it was described by counsel as rolling into a ball and with his hands over his face.
Allen said he did not hit Fredericks, but got up and went to the shop to call the police. He said he did not talk to the police when they came to Beverly, but later he went to the hospital emergency room and talked to police there. Police photographs of scratches and bruises on Allen’s back, chest and face were placed in evidence. Allen said he did not press charges because his supervisor told him if he did, not only would he be dismissed for fighting, but also he would go to jail.
Allen testified that a couple of days later, when he picked up his paycheck, he was handed a termination slip. He testified he had “bad feelings” for Beverly Industries as a result of his termination.
*451 Both Fredericks and Allen testified that prior to this incident, they were friends, and that neither expected the other to physically attack him.
Billie Ray Harris, a co-worker of both Fredericks and Allen, testified he was working as a mechanic on the evening in question. He said that Allen ran into the shop and called the police. Harris said Allen didn’t have a shirt on and was dirty |7and bleeding. Harris said he ran outside and saw Fredericks, who was walking around with his hand on the back of his head, saying, “I can’t believe he hit me, I can’t believe he hit me.” Harris said Fredericks told him that he had been hit with a fire extinguisher. Harris examined Fredericks on the scene and found nothing wrong with the back of his head. In addition, Harris said that he specifically said he was “fine,” and that he didn’t want to go to the hospital. Fredericks did not complain to Harris of dizziness or any other problems. Harris said they kept Fredericks in the shop for one or two hours afterward, “to make sure they wouldn’t meet up down the road to fight or anything.”
Harris had worked with Fredericks for several months preceding this incident. He testified that about a month preceding the dispute with Allen, Fredericks got into a “bad argument” with another employee, in which Harris stepped in and broke them up “so they wouldn’t lose their job.”
Dr. Michael Friley, who saw Fredericks two days after the incident, immediately sent him to the emergency room after Fredericks said he had been struck in the head. Dr. Friley’s records simply indicate a diagnosis of closed head injury and referral to emergency room for a CT scan. In his deposition, Dr. Friley said he made no objective findings when he examined Fred-ericks, but referred him to the emergency room for a CT scan to make sure there were no problems and to protect the doctor from legal responsibility. Several weeks later, at the request of Fredericks’ counsel, he referred Fredericks to a neurologist and an orthopedic surgeon.
West Jefferson Medical Center emergency room records state the diagnostic impression as scalp contusion and cervical strain. The records indicate Fredericks stated he “got right up and beat the other guy up.” The CT scan results found no acute intracranial abnormalities in his head and found a normal cervical spine.
^Approximately three weeks after the incident, Fredericks was examined by Dr. Daniel Gallagher at the Bone & Joint Clinic. In a letter to LUBA, a workers’ compensation insurance administrator, Dr. Gallagher stated that his examination of Fredericks was “essentially normal with positive Waddell’s signs,” and that he “does show signs of symptom exaggeration and malingering during his examination.” Dr. Gallagher recommended he be referred to a neurologist for evaluation for his complaints of headaches and nerve problems.
In his deposition Dr. Gallagher testified that the positive Waddell’s signs are signs that the patient is exaggerating his symptoms. He said it was his opinion at the time that there wasn’t anything wrong and Fredericks was exaggerating his complaints. He referred Fredericks to a neurologist because of the headache complaints, because that is not Dr. Gallagher’s area of specialty and, since Fredericks was struck in the head, he could have had some neurological damage to his brain.
Dr. Leon Weisberg, a neurologist who examined Fredericks at the request of defense counsel, testified by deposition. Based on questions he posed to Fredericks and Fredericks’ responses, Dr. Weisberg found a “marked discrepancy” between *452 what Fredericks told the doctor he was able to do and what his cognitive examination revealed he can do. Specifically, Dr. Weisberg said, Fredericks reported a capability of living independently and handling his own finances. Based on his responses to questions on mental status, however, if those were accurate responses, Fredericks would not have been able to do that. The doctor noted, however, that Fredericks also was very depressed, very anxious, and frustrates 1 fleasily, which may explain the discrepancies. The doctor found no objective findings except on things that are not related to trauma.[1]
Dr. Weisberg felt that Fredericks had sustained a trivial head injury, that is, one from which neuro-behavioral sequelae would not be expected, and that he did not have any neurological disturbances. He remarked, “Most patients who have a significant head injury usually don’t rise off the floor and pound their perpetrator.”
On December 10, 2003 Fredericks was examined at the Culicchia Neurological Clinic for complaints of headaches, blurry vision, back pain radiating into his legs, ankle pain, and right foot pain. Dr. Syed Nasir described the headaches as “post-traumatic” and, after testing, attributed other symptoms to a degenerative lumbo-sacral disc. He prescribed pain medication and physical therapy.
LAW AND ANALYSIS
La.R.S. 23:1081 states that no compensation shall be allowed for an injury caused by the employee’s willful intention to injure himself or to injure another, or to the initial physical aggressor in an unprovoked physical altercation, unless excess force was used in retaliation against the initial aggressor.
[T]he plaintiff-worker in a compensation action has the burden of establishing a work-related accident by a preponderance of the evidence. A worker’s testimony alone may be sufficient to discharge the burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker’s version of the incident; and (2) the worker’s testimony is corroborated by the circumstances following the alleged incident. Corroboration of the worker’s testimony may be provided by the testimony of fellow workers, spouses or friends. Corroboration may also be provided by medical evidence.
* * *
hnThe trial court’s determinations as to whether-the worker’s testimony is credible and whether the worker has discharged his or her burden of proof are factual determinations not to be disturbed on review unless clearly wrong or absent a showing of manifest error. [Citations omitted.]
Bruno v. Harbert Intern. Inc., 593 So.2d 357, 361 (La.1992).
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s *453 story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a fact-finder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. [Citations omitted.]
Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989).
Applying those guidelines to this case, we are unable to find that the trial court was manifestly erroneous or clearly wrong, because the judge’s ruling was based on credibility determinations between the plaintiff and the other witnesses. See Bernard v. Cox Communications, Inc., 01-1321, pp. 7-8 (La.App. 5 Cir. 3/26/02), 815 So.2d 259, 264-265, writ denied 2002-1157 (La.6/14/02), 818 So.2d 782.
Fredericks argues that the OWC judge erred in believing Allen’s testimony, because “the testimony of Allen is suspicious and unreliable.” He points to portions of Allen’s testimony that he asserts were illogical or inconsistent or “unlikely.” Nevertheless, the appellant has set out nothing to show the trial judge was clearly wrong. Rather, the disagreement here goes to the heart of the Incredibility rule. It is the very nature of a credibility determination to turn on evaluations of subtle distinctions — “the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said,” as stated in Rosell v. ESCO, supra. Allen’s version of events is not so implausible that a reasonable factfinder could not believe it. There is nothing to show the factfinder here was clearly wrong.
Although the threshold issue in the case was whether Fredericks was disqualified by the aggressor doctrine of La.R.S. 23:1081, Fredericks’ injury claims also invite disbelief. Contrary to his assertions in his brief, the medical evidence does not support his claims of injury arising from this incident. Further, although he has not returned to work and states he has not been released to return to work, we find nothing in the medical records to indicate that any doctor ever told him he could not continue to work. If no doctor stated that he cannot work, there is no reason for one to state he should return to work.
Fredericks also challenges the OWC judge’s determination that his claim is fraudulent. Like his eligibility for benefits, that determination is governed by the manifest error standard. We find no clear error in the judge’s determination and will not overturn it.
Finally, Fredericks raises the issue of wrongful termination, which was raised in his Disputed Claim for Compensation, but was never addressed at trial. Wrongful termination or retaliatory discharge is not within the jurisdiction of the Office of Workers’ Compensation. A discriminatory discharge action is not a worker’s compensation matter nor a claim for worker’s compensation benefits and ancillary penalties, but is a delictual employment law matter within the jurisdiction of the district court, not of the Office of Worker’s Compensation. Trombatore v. Saia Motor Freight Line, 627 So.2d 1387, 1389 (La.App. 5 Cir.1993), writ den. 1,a94— 120, 94-125 (La.3/11/94), 634 So.2d 393. Hence, it is not properly before us in this appeal.
For the foregoing reasons, the judgment is affirmed. Costs of appeal are assessed against the appellant.

AFFIRMED.

. Dr. Weisberg noted that Fredericks' non-trauma-related symptoms could be caused by exposure to toxic chemicals or materials. At the time of trial of this matter, Fredericks was a plaintiff in a class-action suit regarding a toxic chemical release.